Mr. Justice Douglas
delivered the opinion of the Court.
This is a suit for damages under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, for violation of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. §§ 1, 2. The complaint grows out of a so-called retail dealer “consignment” agreement which, it is alleged, Union Oil requires lessees of its retail outlets to sign, of which Simpson was one. The “consignment” agreement is for one year and thereafter until canceled, is terminable by either party at the end of any year and, by its terms, ceases upon any termination of the lease. The lease is also for one year; and it is alleged that it is used to police the retail prices charged by the consignees, renewals not being made *147 if the conditions prescribed by the company are not met. The company, pursuant to the “consignment” agreement, sets the prices at which the retailer sells the gasoline. While “title” to the consigned gasoline “shall remain in Consignor until sold by Consignee,” and while the company pays all property taxes on all gasoline in possession of Simpson, he must carry personal liability and property damage insurance by reason of the “consigned” gasoline and is responsible for all losses of the “consigned” gasoline in his possession, save for specified acts of God. Simpson is compensated by a minimum commission and pays all the costs of operation in the familiar manner.
The retail price fixed by the company for the gasoline during the period in question was 29.9 cents per gallon; and Simpson, despite the company’s demand that he adhere to the authorized price, sold it at 27.9 cents, allegedly to meet a competitive price. Solely because Simpson sold gasoline below the fixed price, Union Oil refused to renew the lease; termination of the “consignment” agreement ensued; and this suit was filed. The terms of the lease and “consignment” agreement are not in dispute nor the method of their application in this case. The interstate character of Union Oil’s business is conceded, as is the extensive use by it of the lease-consignment agreement in eight western States.[1]
After two pretrial hearings, the company moved for a summary judgment. Simpson moved for a partial summary judgment — that the consignment lease program is *148 in violation of § § 1 and 2 of the Sherman Act. The District Court, concluding that “all the factual disputes” had been eliminated from the case, entertained the motions. The District Court granted the company’s motion and denied Simpson’s, holding as to the latter that he had not established a violation of the Sherman Act and, even assuming such a violation, that he had not suffered any actionable damage. The Court of Appeals affirmed. While it assumed that there were triable issues of law, it concluded that Simpson suffered no actionable wrong or damage, 311 F. 2d 764. The case is here on a writ of cer-tiorari. 373 U. S. 901.
We disagree with the Court of Appeals that there is no actionable wrong or damage if a Sherman Act violation is assumed. If the “consignment” agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices. The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws.
There is actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market ; and it matters not that the complainant may be only one merchant. See Klor’s v. Broadway-Hale Stores, 359 U. S. 207, 213; Radiant Burners v. Peoples Gas Co., 364 U. S. 656, 660. As we stated in Radovich v. National Football League, 352 U. S. 445, 453-454:
“Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public.”
*149 The fact that, on failure to renew a lease, another dealer takes Simpson’s place and renders the same service to the public is no more an answer here than it was in Poller v. Columbia Broadcasting System, 368 U. S. 464, 473. For Congress, not the oil distributor, is the arbiter of the public interest; and Congress has closely patrolled price fixing whether effected through resale price maintenance agreements or otherwise.[2] The exclusive requirements contracts struck down in Standard Oil Co. v. United States, 337 U. S. 293, were not saved because dealers need not have agreed to them, but could have gone elsewhere. If that were a defense, a supplier could regiment thousands of otherwise competitive dealers in resale price maintenance programs merely by fear of nonrenewal of short-term leases.
We made clear in United States v. Parke, Davis & Co., 362 U. S. 29, that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive device is. United States v. Colgate, 250 U. S. 300, as explained in Parke, Davis, 362 U. S., at 37, was a case where there was assumed to be no agreement to maintain retail prices. Here we have such an agreement; it is used coercively, and, it promises to be equally if not more effective in maintaining gasoline prices than were the Parke, Davis techniques in fixing monopoly prices on drugs.
Consignments perform an important function in trade and commerce, and their integrity has been recognized by many courts, including this one. See Ludvigh v. American Woolen Co., 231 U. S. 522. Yet consignments, though useful in allocating risks between the parties and determining their rights inter se, do not necessarily con *150 trol the rights of others, whether they be creditors or sovereigns. Thus the device has been extensively regulated by the States. 22 Am. Jur., Factors, § 8; Hartford Indemnity Co. v. Illinois, 298 U. S. 155. Congress, too, has entered parts of the field, establishing by the Act of June 10, 1930, 46 Stat. 531, as amended, 7 U. S. C. § 499a et seg., a pervasive system of control over commission merchants dealing in perishable agricultural commodities.
One who sends a rug or a painting or other work of art to a merchant or a gallery for sale at a minimum price can, of course, hold the consignee to the bargain. A retail merchant may, indeed, have inventory on consignment, the terms of which bind the parties inter se. Yet the consignor does not always prevail over creditors in case of bankruptcy, where a recording statute or a “traders act” or a “sign statute” is in effect. 4 Collier, Bankruptcy (14th ed.), pp. 1090-1097, 1484-1486. The interests of the Government also frequently override agreements that private parties make. Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy. Thus a consignment is not allowed to be used as a cloak to avoid § 3 of the Clayton Act. See Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 353-356; cf. Straus v. Victor Talking Mach. Co., 243 U. S. 490, 500-501. Nor does § 1 of the Sherman Act tolerate agreements for retail price maintenance. See United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 221-222; United States v. Parke, Davis & Co., supra.
We are enlightened on present-day marketing methods by recent congressional investigations. In the automobile field the price is “the manufacturer’s suggested retail price,” [3] not a price coercively exacted; nor do automo *151 biles go on consignment; they are sold.[4] Resale price maintenance of gasoline through the “consignment” device is increasing.[5] The “consignment” device in the gasoline field is used for resale price maintenance. The theory and practice of gasoline price fixing in vogue under the “consignment” agreement has been well exposed by Congress. A Union Oil official in recent testimony before a House Committee on Small Business explained the price mechanism:
“Mr. Roosevelt. Who sets the price in your consignment station, dealer consignment station?
“Mr. Rath. We do.
“Mr. Roosevelt. You do?
“Mr. Rath. Yes. We do it on this basis: You see, he is paid a commission to sell these products for us. Now, we go out into the market area and find out what the competitive major price is, what that level is, and we set our house-brand price at that.” [6]
*152 Dealers, like Simpson, are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. The risk of loss of the gasoline is on them, apart from acts of God. Their return is affected by the rise and fall in the market price, their commissions declining as retail prices drop.[7] Prac *153 tically the only power they have to be wholly independent businessmen, whose service depends on their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by Union Oil. By reason of the lease and “consignment” agreement dealers are coercively laced into an arrangement under which their supplier is able to impose noncompetitive prices on thousands of persons whose prices otherwise might be competitive. The evil of this resale price maintenance program, like that of the requirements contracts held illegal by Standard Oil Co. v. United States, supra, is its inexorable potentiality for and even certainty in destroying competition in retail sales of gasoline by these nominal “consignees” who are in reality small struggling competitors seeking retail gas customers.
As we have said, an owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner. There is nothing illegal about that arrangement. • When, however, a “consignment” device is used to cover a vast gasoline distribution system, fixing prices through many retail outlets, the antitrust laws prevent calling the “consignment” an agency,[8] for then the end result of United States v. Socony- *154 Vacuum Oil Co., supra, would be avoided merely by clever manipulation of words, not by differences in substance. The present, coercive “consignment” device, if successful against challenge under- the antitrust laws, furnishes a wooden formula for administering prices on a vast scale.[9]
Reliance is placed on United States v. General Electric Co., 272 U. S. 476, where a consignment arrangement was utilized to market patented articles. Union Oil correctly argues that the consignment in that case somewhat *155 parallels the one in the instant case.[10] The Court in the General Electric case did not restrict its ruling to patented articles; it, indeed, said that the use of the consignment device was available to the owners of articles “patented or otherwise.” Id., at 488. But whatever may be said of the General Electric case on its special facts, involving patents, it is not apposite to the special facts here.
The Court in that case particularly relied on the fact that patent rights have long included licenses “to make, use and vend” the patented article “for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.” Id., at 489. Congress in establishing the patent system included 35 U. S. C. § 154, which provides in part: “Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the right to exclude others from, making, using, or selling the invention throughout the United *156 States, referring to the specification for the particulars thereof.” (Italics added.)
“The right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee.” Adams v. Burke, 17 Wall. 453, 456. Long prior to the General Electric case, price fixing in the marketing of patented articles had been condoned (Bement v. National Harrow Co., 186 U. S. 70), provided it did not extend to sales by purchasers of the patented articles. Adams v. Burke, supra; Ethyl Gasoline Corp. v. United States, 309 U. S. 436.
The patent laws which give a 17-year monopoly on “making, using, or selling the invention” are in pari materia with the antitrust laws and modify them pro tanto. That was the ratio decidendi of the General Electric case. See 272 U. S., at 485. We decline the invitation to extend it.
To allow Union Oil to achieve price fixing in this vast distribution system through this “consignment” device would be to make legality for antitrust purposes turn on clever draftsmanship. We refuse to let a matter so vital to a competitive system rest on such easy manipulation. Cf. United States v. Masonite Corp., 316 U. S. 265, 280.
Hence on the issue of resale price maintenance under the Sherman Act there is nothing left to try, for there was an agreement for resale price maintenance, coercively employed.
The case must be remanded for a hearing on all the other issues in the case, including those raised under the McGuire Act, 66 Stat. 631,15 U. S. C. § 45, and the damages, if any, suffered. We intimate no views on any other issue; we hold only that resale price maintenance through the present, coercive type of “consignment” agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage. We reserve the ques *157 tion whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the “consignment” device which we announce today.

Reversed and remanded.

Me. Justice Harlan took no part in the disposition of this case.

As of December 31, 1957, Union Oil supplied gasoline to 4,133 retail stations in the eight western States of California, Washington, Oregon, Nevada, Arizona, Montana, Utah and Idaho. Of that figure, 2,003 stations were owned or leased by Union Oil and, in turn, leased or subleased to an independent retailer; 14 were company-operated training stations; and the remaining 2,116 stations were owned by the retailer or leased by him from third persons. Union Oil had “consignment” agreements as of that date with 1,978 (99%) of the lessee-retailers and with 1,327 (63%) of the nonlessee-retailers.

 See the McGuire Act, 66 Stat. 631, 15 U. S. C. §45; the Miller-Tydings Act, 50 Stat. 693, 15 U. S. C. § 1; United States v. Socony-Vacuum Oil Co., 310 U. S. 150.

 H. R. Rep. No. 1958, 85th Cong., 2d Sess., S. Rep. No. 1555, 85th Cong., 2d Sess.

 H. R. Rep. No. 1958, supra, note 3, at 1.

 See H. R. Rep. No. 1157, 85th Cong., 1st Sess., pp. 6-7. The Assistant Attorney General in charge of the Antitrust Division, Department of Justice, testified:
“Another issue relating to price fixing concerns certain of the practices which the major oil companies have used to preserve their tank wagon price structure; for example, the placing of the dealer on a commission or consignment agency basis, which narrows his normal margin of profit and effectively fixes the retail price.” Id., at 7. The Committee report said:
“One of the effects of this expansion of commission and consignment outlets is that more and more service station operators lose their status as independent businessmen. The selling price and gross margin of profit per gallon in the commission-type stations are wholly within the control of the supplier.” Ibid.

 See Hearings, House Select Committee on Small Business, 85th Cong., 1st Sess., H. R. Res. 56, Pt. Ill, pp. 79-80. The same official *152 gave this justification for the consignment program — a justification similar to that traditionally advanced for resale price maintenance:
“Consignment is our method of protecting our dealers’ profit margins during disturbed retail price conditions, at the same time maintaining our dealers’ positions as people handling a premium quality product. We have not used consignment as a means of unfair competition, nor has it been used to price any dealer out of any station. It has instead been used by us to maintain a competitive relationship between our dealers’ prices and those of our competitors.
“We are proud of our retail consignment program which has accomplished the ends outlined above. We have been able to make these accomplishments without taking away any of the independence of our dealers. Through our consignment program we have established and maintained under all conditions the minimum guaranteed margins for our dealers that are the best in the industry. It has brought our dealers one other substantial benefit also — and I would like to point this out strongly — they have available for other uses the investment which otherwise would be in gasoline inventories. This amounts to an average of $2,500 per dealer.
“If there is any suspicion or resentment by any dealers or dealer groups, it certainly appears that Union Oil Co.’s retail consignment program is a greatly misunderstood one. It does not remove any aspect of a dealer’s independence other than giving us the right to name the dealer’s selling prices. It has not been used to create or disturb any retail price situations and instead has, as a matter of fact, contributed materially to the economic welfare of our dealers.
“If we were today to withdraw the consignment program as it is now set up, we know that such action would be bitterly opposed by our dealers. Any problems that are laid at its doorstep — and there were some problems as there are in any new program — have been corrected to the point that a survey of our dealers today would reveal that the great majority of them are heartily in favor of consignment. We are able to offer the names of hundreds of our dealers who are in favor of the program.” Id., at 86-87.

 The basic agreement in force during most of the period when Simpson was a consignee provided that his commission was per *153 gallon more than the amount by which the price at which the company “authorized” him to sell exceeded a posted “tank wagon” price applicable to those gallons. However, if the “authorized” price fell below a posted “minimum retail” price, the commission was reduced by 50% of the difference between “minimum retail” and “authorized” retail. In no event could the commission be less than 5.950 for regular and 5.750 for ethyl.
Shortly before Simpson ceased to be a consignee the program was changed. The guaranteed minimum was eliminated and the consignee absorbed 20% of the difference if “authorized” prices fell below “minimum retail.” If the “authorized” price exceeded “minimum retail,” the commission increased by 80% of the excess, as compared with 100% thereof under the former plan.

 See Klaus, Sale, Agency and Price Maintenance, 28 Col. L. Rev. 312, 441, 443-454 (1928).

 A. A. Berle recently described the critical importance of price control to money making by the large oligarchies of business, or the “behemoths" as he calls them:
“Are these behemoths good at making goods — or merely good at making money ? Do they come out better because they manufacture more efficiently — or because they ‘control the market' and collect unduly high prices from the long-suffering American consumer?
“Again, no one quite knows. It is pretty clear that most prices are established only partly by competition, and partly by administration. Economists are just beginning to wrestle with the problem of 'administered' prices. The three or four ‘bigs’ in any particular line are happy to stay with a good price level for their product. If the price gets too high, some smart vice president in charge of sales may see a chance to take a fat slice of business away from his competitors.
“But while any one of the two or three bigs knows he can reduce prices and start taking all the business there is, he knows, too, that one or all of his associates will soon drop the price below that. In the ensuing price war, nobody will make money for quite a while.
“So, an uneasy balance is struck, and everyone’s price remains about the same. Shop around for an automobile and you will see how this works. Economists call it ‘imperfect competition’ — a tacitly accepted price that is not necessarily the price a stiff competitive free market would create. Only big concerns can swing this sort of competition effectively.
“We do not really know whether bigs make more money because they are efficient or because, through their size, they can ‘administer’ prices.” Bigness: Curse or Opportunity? New York Times Magazine, Feb. 18, 1962, pp. 18, 55, 58.

 In General Electric the consignee was responsible for lost, damaged or missing items from the stock in his possession and the consignor assumed all risks of fire, flood and obsolescence, while in the instant case the consignee is “responsible to Consignor for all gasolines consigned to him, or for loss thereof or damage thereto from any cause whatsoever other than earthquake, lightning, flood, fire or explosion.not caused by his negligence and will pay Consignor for all gasolines sold, lost or damaged."
In General Electric the consignees were, in their regular business, wholesale or retail merchants of other merchandise and some of them had previously so handled the consignor’s lamps, while in the instant case the consignees, although some of them had previously been regular retail merchants, deal exclusively in the consignor’s gasoline.
General Electric Co. paid “all” taxes assessed on the stock of lamps, whereas Union Oil pays only property taxes.
General Electric Co. carried “whatever insurance is carried” on the stock held by consignees, while Union Oil apparently is not obligated to carry any insurance.