**FUCHS SUGARS & SYRUPS, INC., and Francis J. Prael, doing business as Lewis & Company, Plaintiffs,**

v.

**AMSTAR CORPORATION, Defendant.**

**No. 74 Civ. 2945 R.J.W.**

United States District Court,
S. D. New York.
Aug. 28, 1974.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs; H. Richard Wachtel, Grant S. Lewis, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; William E. Willis, James H. Carter, Jr., New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs in this action are two among several "general sugar brokers" whose services in distributing sugar products were terminated on March 30, 1974 by defendant Amstar Corporation ("Amstar"), a leading manufacturer of refined cane sugar. The complaint alleges violations of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and by order to show cause, plaintiffs move for a preliminary injunction pursuant to 15 U.S.C. § 26, ordering their reinstatement as distributors of Amstar's products. After oral argument and full consideration of the papers submitted in support of this motion, the Court determines that although substantial legal questions exist, plaintiffs have not demonstrated probable success on the merits and threat of irreparable harm, nor predominance of hardships, which would warrant the preliminary relief requested.

General sugar brokers have traditionally negotiated among many buyers and many sellers of refined sugar products, using their knowledge of market conditions, their access to both buyers and sellers, and, on occasion, transportation services, to arrange sales of sugar, in return for a commission paid entirely by the seller. The brokers compete among themselves, and consequently, in order to make the sales, negotiate for the lowest possible price to the buyer. This has created a situation in which, on behalf of the buyer, the broker stimulates competition among sellers, inducing them to offer either lower prices or long term contracts, since otherwise, through the same broker, the buyer could go elsewhere. At the same time, since their commissions are paid in proportion to volume of sales, the brokers do attempt to sell, on behalf of the refiners, ever increasing quantities of sugar products. Thus, it can be said that they perform services for both seller and buyer, although their commissions are paid entirely by the seller. Sugar brokers have operated in this way for over seventy-five years. In particular, plaintiffs herein have each been in business for approximately fifty years, and by their account, are leading general sugar brokers.

As noted above, Amstar is a leading manufacturer of refined cane sugar. It presently sells to three major categories of customers, namely, grocery stores, industrial manufacturers of food products requiring sugar, and restaurants and hotels which use sugar, spices and condiments packaged in teaspoon-size packets. Plaintiffs have traditionally negotiated sales to all three categories of customers. Each is an easily defined market, with possible sub-markets; plaintiffs contend that there are well defined geographic contours to defendant's markets as well. Plaintiffs claim that while defendant controls a large share of all markets for refined sugar products, in some markets it possesses a virtual monopoly. They contend that in their traditional role they have been able to mitigate the effects of this monopoly position, stimulating "intra-brand competition" by using their power to divert certain buyers to other refiners offering more favorable terms, in order to induce defendant selectively to offer such terms to those buyers. Thus in recent years the quoted or list price of sugar has been almost meaningless, and the practice of discounting widespread. Plain-

tiffs contend that Amstar's ceasing to use their services is both an impermissible attempt to extend its dominant market position, and part of a continued effort to stabilize and raise the price of sugar.

At the same time that Amstar has switched to the use of direct brokers, it has negotiated long term and requirements contracts with a number of its customers. As a result, even insofar as they continue to represent other refiners in their sales efforts, plaintiffs are unable to sell sugar to certain former customers.

Amstar refutes plaintiffs' assessment of its dominant market position by providing lists of its competitors and generally denying the validity of the geographic factors plaintiffs cite. It asserts that its decision to cease using general brokers is not an attempt to monopolize, but resulted from a judgment that many legitimate business reasons compelled it to sell its product through agents who had no conflict of interest, and who would develop specialized expertise in distributing its product in each of its major categories of customers. It initially tried to achieve this result by soliciting among the general brokers certain brokers who would promise to act exclusively for Amstar. Both plaintiffs were so solicited, at various times, for different markets. The parties never achieved a mutually satisfactory relationship, and Amstar now charges that plaintiffs' conduct has been a betrayal of their obligations as Amstar's agents. Amstar determined to stop using general brokers at all, and since March 30, 1974, distributes its product only through its own sales staff or through direct brokers, either food brokers or food service brokers. The direct brokers it uses may distribute other products for other manufacturers, but none distributes sugar for other refiners. Amstar contends that these direct brokers provide important services to the customers which plaintiffs did not.

15 U.S.C. § 26 provides that in the case of threatened loss or damage by a violation of the antitrust laws, upon "a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue." Plaintiffs, in order to obtain such an injunction ordering their reinstatement as general sugar brokers for Amstar, must demonstrate either probable success on the merits and the possibility of irreparable damage, or the existence of serious questions going to the merits and markedly greater hardships than defendant would suffer should an injunction issue. *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir. 1969), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Moreover, the threatened loss may not be one which is readily compensable in money damages. *H. E. Fletcher Co. v. Rock of Ages Corp.,* 326 F.2d 13 (2d Cir. 1963).

Plaintiffs argue that defendant's termination of their services was designed to stabilize and raise the price of sugar to the retailer or industrial user who initially purchases the refined product. This, they contend, brings this case within *Simpson v. Union Oil Company of California,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). There the Court refused to allow termination of a franchise when gasoline consigned to the distributor for sale was sold at a price below that set by the manufacturer, finding this a coercive price-fixing scheme. Defendant contends that its sugar was never even consigned to plaintiffs, but that in their brokerage relationship plaintiffs were solely defendant's agents, subject to its direction concerning all sales matters, including price. Since the sale to the retailer or industrial user, although negotiated by the broker, is the first sale of the item, there is no prohibited resale price maintenance, Amstar argues. *See* Mr. Justice Stewart's dissent in *Simpson, supra,* 377 U.S. at 28, 84 S.Ct. 1051.

*Simpson* mandates a close examination of the facts and the market structure, to determine the precise relationship of the distributor to both the manufacturer and the retailer. "When, however, a

'consignment' device is used to cover a vast gasoline distribution system, fixing prices through many retail outlets, the antitrust laws prevent calling the 'consignment' an agency, for then the end result of United States v. Socony-Vacuum Oil Co., *supra*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, would be avoided merely by clever manipulation of words, not by differences in substance." 377 U.S. at 21–22, 84 S.Ct. at 1057. It is not clear to this Court that plaintiffs, in their traditional role, were solely Amstar's agents, as defendant argues, or alternatively, solely the buyers' agents.* From the papers it appears that plaintiffs' status is something in between and that, in their traditional role, they may have uniquely furthered competitive pricing to a degree that their replacement is an antitrust violation because in purpose or effect it is the equivalent of price fixing. Yet it is also quite possible that the facts that the brokers merely negotiated the sale, and that the sale was to retailers rather than the ultimate purchaser, make their function significantly different from that of the consignee-retailer distributor, for purposes of antitrust law and policy. This determination must await further exposition of the facts.

■ Thus, the Court is not convinced that Amstar's actions constitute a scheme to fix prices, which would be *per se* illegal, but rather sees numerous factual and legal questions. If defendant's actions are not price fixing, but instead more analogous to granting an exclusive franchise to distribute, they will be scrutinized under the rule of reason. White Motor Co. v. United States, 372

U.S. 253 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). It does not yet clearly appear to this Court that defendant has acted with the purpose or the effect of reducing competition or unlawfully extending a monopoly position in the market, by its decision to substitute direct brokers for plaintiffs, simultaneously negotiating requirements contracts with many of its customers. *See Schwinn, supra,* see also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 468 (1962). Amstar has cited legitimate business reasons for its decision, and it may be that competition among refiners, among brokers, and among buyers continues unabated. The rise in the price of sugar products alone, particularly when reasonably attributable in large measure to the rising cost of raw sugar, does not prove an anticompetitive effect caused by defendant's acts.

Although this case presents serious questions going to the merits, warranting further deliberate consideration in the context of litigation, plaintiffs have not, at this juncture, demonstrated probable success upon the merits. Therefore, the granting or denial of preliminary injunctive relief depends upon the balance of hardships among the parties. Plaintiffs' demonstrated injury is primarily financial. It results in part from the loss of commissions on sales of Amstar products. In the industrial sugar market, plaintiffs are prevented from recovering some of this loss by selling the products of other refiners to purchasers to whom they previously sold

---

* If plaintiffs were in fact representing the buyers rather than the sellers in this brokerage arrangement, Amstar insists that its continuing to pay commissions would violate § 2(c) of the Clayton Antitrust Act, 15 U. S.C. § 13(c). That section provides:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, .brokerage, or other compensation, or any allowance or discount in

lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Amstar sugar, because Amstar has arranged long term or requirements contracts with those purchasers. Moreover, plaintiffs claim, although defendant disputes, that in the grocery market, they are hampered by their inability to provide Amstar sugar in combination with another brand or with private label sugar in relatively small quantities, so that purchasers choose now to confine themselves to the single Amstar label. In the restaurant market, plaintiffs have not specifically itemized their injury. As a result of these financial losses, and accompanying loss of good will, plaintiffs claim that they will imminently be forced to cease doing business.

Defendant responds with the contention that its competitors presumably continue to use plaintiffs' services, and plaintiffs have not demonstrated that they are or will be wholly unable to act as brokers for sales of sugar. But, Amstar contends, it will be irreparably harmed if required to use plaintiffs to sell its product. It has determined that the service plaintiffs once performed can be better provided by its own agents, who are now trained and established, representing Amstar exclusively and being solicitous of other customer needs. Amstar sugar, it claims, will be less effectively sold by plaintiffs, whose interests are now clearly adverse to its own, or by a combination of plaintiffs and Amstar's own agents. Amstar itself will suffer a loss of good will, it claims, should it be required to reinstate plaintiffs even for a short time. And should it prevail upon the merits, it will have unnecessarily disrupted its new sales organization, decreased its effectiveness, and suffered losses which would be difficult to measure.

In the judgment of this Court, plaintiffs have not presented sufficient evidence that their business will be irreparably damaged in the interval before trial. The hardships they are suffering are primarily financial, compensable in money damages. Furthermore, plaintiffs delayed from March 30, 1974 to July 10, 1974 before bringing this mo-

tion. Amstar has demonstrated hardships of a more intangible nature, which would result from being required to resume use of plaintiffs' brokerage services pending trial, with the outcome after trial uncertain.

With the hardships so balanced, and the legal and factual questions serious but by no means certain, this Court does not consider an injunction ordering plaintiffs' reinstatement pending trial to be warranted. Accordingly, the motion is denied and the parties are directed to agree on an accelerated discovery schedule. In the event the parties are unable to reach an agreement within ten days of the date of this decision, application may be made to the Court to set a discovery schedule.

It is so ordered.