577 F.2d 468
 1978-1 Trade Cases 61,910
 CANADIAN AMERICAN OIL COMPANY and Frederick M. Tautenhahn,
etc., Plaintiffs-Appellants,
v.
UNION OIL COMPANY OF CALIFORNIA, Defendant-Appellee.
 No. 76-1672.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 17, 1978.
Rehearing Denied June 1, 1978.
 
 Maxwell P. Keith (argued), San Francisco, Cal., for plaintiffs-appellants.
 John E. Sparks (argued), San Francisco, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before HUFSTEDLER and KENNEDY, Circuit Judges, and JAMESON,* District Judge.
 PER CURIAM:
 
 
 1
 Appellants appeal from a judgment dismissing their antitrust complaint against Union Oil Company of California ("Union"). The district court concluded that it lacked jurisdiction of the subject matter because the complaint failed to state sufficient facts to demonstrate that the challenged activities had sufficient impact upon the flow of interstate commerce to permit appellants to invoke the Sherman Act, Sections 1 and 2 (15 U.S.C. §§ 1, 2). Appellants contend that the complaint stated more than adequate facts to establish that the acts complained of occurred within the flow of interstate commerce and that those acts which occurred wholly intrastate substantially affected interstate commerce. We agree with the appellants.
 
 
 2
 Appellants also claim that the district court abused its discretion in issuing unduly restrictive discovery orders and in preventing appellants from amending their complaint to assert cross-claims for fraudulent promises of a sign rental allowance to counter an affirmative defense in the answer. We remand for reconsideration in the light of our disposition of the jurisdictional issue. We dismiss the third contention for mootness.
 
 
 3
 Appellants operate large volume gasoline service stations in the greater San Francisco Bay Area. Among their holdings are the two service station properties involved in this case, Alec's in San Jose and Alex's in Fremont. Appellants' combined ownership of the two stations in issue, together with other service stations in the area, gave them power to offer to any gasoline supplier outlets for about 13 million gallons of gasoline per year.
 
 
 4
 In February and March, 1972, appellants began negotiating a gasoline supply contract with Union for delivery to two of their service stations. In April, 1972, Union and appellants executed a gasoline purchase contract for Union brand gasoline to be sold at their San Jose and Fremont stations. The contract provided that appellants would pay the standard "Posted Dealer Purchase Price" for the gasoline, but all parties understood that appellants would shortly be entitled to a two cents per gallon discount on the price, which was to be given by Union in the form of a sign rental agreement. Appellants were also led to believe that within a few months, they would be entitled to a Union jobbership, if they showed themselves to be satisfactory dealers. The possibility of obtaining the jobbership particularly interested appellants and was one of the main inducements to them to undertake dealing with Union.
 
 
 5
 Appellants began selling Union gasoline at their San Jose and Fremont stations in April, 1972. They priced their gasoline from two to five cents below the prevailing market prices for other major brand gasolines in the area. Competing Union dealers complained about the price cutting to Union. Union representatives contacted appellants and urged them to keep their prices within two cents of the prevailing market price. Appellants, however, persisted in their price-cutting practices. Union countered the refusal of appellants to raise their prices by denying appellants' request for the promised sign rental discount and for the jobbership. Appellants threatened to sue Union for its refusal to bestow the promised benefits, and Union retaliated by invoking the 90-day termination clause on their gasoline supply contract and terminated appellants as Union dealers. Appellants remained in business at the two stations by selling Phillips Petroleum products at the two locations.
 
 
 6
 Appellants received approximately $35,000.00 of gasoline from Union on Labor Day weekend, 1972. Union's representative did not collect $10,000.00 on the Friday before the weekend and did not notify Union's supply terminals. Appellants deducted the amount of sign rental allowances at two cents per gallon from the amount it owed Union for gasoline purchases and advised Union that they would not pay any more, claiming the sign rental allowance as a legitimate offset. Thereafter, appellants paid Union approximately $10,000.00 for gasoline delivered on the Labor Day weekend, and Union filed a collection action in the state court to recover the remaining price. Appellants filed this antitrust action, and Union counterclaimed for goods sold and delivered and for conversion. Appellants sought damages for refusal to pay the two-cent per gallon sign rental allowance, for failure to inform appellants of adjustment in the price of gasoline, for loss of profits in the cancellation of the three-year supply agreement as to the two stations, and for loss of profits arising from the refusal to allow them the jobbership agreement because of their pricing policies.
 
 
 7
 The two service stations are located in shopping centers within the borders of California, and neither is adjacent to an interstate highway. Their customers are largely local suburban residents. During 1972, appellants' combined purchases for both stations varied from a high of 284,512 gallons for the month of May to a low of 273,250 gallons in July. All of the Union gasoline distributed to appellants was refined in California at Union's Oleum refinery. During 1972, total shipments of gasoline from the Oleum refinery averaged 33,321 barrels per day. From Oleum, the gasoline was shipped via pipeline to San Jose, California, and then trucked from the San Jose terminal to appellants' stations. Appellants allege that Union, through exchange agreements with other major gasoline suppliers, also mingled out-of-state gasoline in the transporting pipeline. That allegation, however, has not been substantiated through discovery. It is undisputed that large percentages of the raw ingredients used in refining the gasoline are shipped to the Oleum refinery from out of state.
 
 
 8
 While appellants were Union dealers, they purchased their gasoline under a wholesale pricing system which Union utilized throughout the ten states comprising its Western Region. Under the plan, Union would publish "Posted Dealer Purchase Prices" for a given region. The posted dealer price fluctuated in accordance with the prevailing retail prices charged by major competitors in a given region. Union established a retail price of $.082 above the Posted Dealer Purchase Price as a cut-off point for price supports to its dealers. A retail price of $.082 above the Posted Dealer Purchase Price was defined as the "Adjustment Price." If the prevailing retail price was less than the Adjustment Price, Union would reduce its Posted Dealer Purchase Price downward to $.007 for each cent per gallon that the prevailing retail price had fallen below the Adjustment Price. Although the Posted Dealer Purchase Price for individual zones within the Western Region would vary, depending on the prevailing competitor retail price in a given zone and the concomitant need for Union to provide its dealers with price supports, the pricing system was standardized throughout the Western Region. Union dealers were required to purchase under this standard wholesale system; however, their purchase contracts did not require them to sell at the retail level at any set prices.
 
 
 9
 Union is a completely integrated enterprise. Union produces vast quantities of crude oil and natural gas. It has three refineries in California and one in Texas. About one-third of the crude oil utilized by the Union refinery in the Bay Area is shipped from its resources in Alaska. Union also transports crude oil and petroleum products in its own and in leased ships along the seacoast of the West, as well as in foreign commerce. The Northern California market consumes over half of the volume of Oleum refinery, and the remainder is moved by tanker to other markets. The same refinery supplies large amounts of automotive gasoline to the Ports of Portland and Seattle for distribution in those areas, as well as to Hawaii. Union owns and operates petroleum pipelines both intra- and interstate.
 
 
 10
 The Oleum refinery utilizes crude oil supplied from Alaska, as well as additives, such as tetraethyl lead, which is supplied from California, Texas, and Louisiana.
 
 
 11
 Further details of Union's operations are unnecessary to demonstrate that the district court's conclusions that the acts complained of did not occur within the flow of interstate commerce nor substantially affect interstate commerce cannot be sustained.
 
 
 12
 As we pointed out in Gough v. Rossmoor Corp. (9th Cir. 1973) 487 F.2d 373, 375: "The jurisdictional issue is one of constitutional power. Congress intended to extend the substantive prohibitions of the Sherman Act to the farthest reaches of its power under the Commerce Clause, thereby mandating for this nation a competitive business economy to the full extent that Congress could do so under its Constitutional power to regulate interstate and foreign commerce."
 
 
 13
 No detailed exegesis of Union's production, refining, transporting, marketing, and pricing system is necessary to determine, as a matter of law, that Union's activities, including those in which it was engaged with the appellants, both affected the flow of interstate commerce and had a significant impact on interstate commerce, thus supplying the interstate nexus. As the Supreme Court pointed out in Gulf Oil Corporation v. Copp Paving Co. (1974) 419 U.S. 186, 194-95, 95 S.Ct. 392, 398, 42 L.Ed.2d 378: "(I)n enacting § 1 Congress 'wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . .' (citation omitted). Consistently with this purpose and with the plain thrust of the statutory language, the Court has held that, however local its immediate object, a 'contract, combination . . . or conspiracy' nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce. (citation omitted) 'If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' United States v. Women's Sportswear Mfrs. Assn., 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949)." (Accord: Hospital Building Co. v. Rex Hospital Trustees (1976) 425 U.S. 738, 743, 96 S.Ct. 1848, 48 L.Ed.2d 338, quoting Gulf Oil Corporation with approval.)
 
 
 14
 Union's conduct of its business with the appellants, for jurisdictional purposes, was an ingredient of Union's interstate production and distribution scheme. Union's distribution of gasoline to appellants was integrally related to its multistate regional pricing system. It cannot be broken away from the interstate character of Union's commerce in petroleum products by isolating Union's Oleum plant from the interstate production and distribution system of which it was an integral part. Union's pricing policy with respect to the appellants and to its other California dealers has a "substantial effect" on interstate commerce even if its "local" pricing policies were not directed toward interstate commerce and even if its pricing mechanisms fell "far short of causing enterprises to fold or affecting market price." (Hospital Building Co. v. Rex Hospital Trustees, supra, 425 U.S. at 745, 96 S.Ct. at 1853.)
 
 
 15
 The district court recognized that the appellants lost both the two-cent per gallon discount on the price and the opportunity for a jobbership in retaliation for appellants' "renegade pricing policies." The court nevertheless held that Union's conduct was outside the ambit of Simpson v. Union Oil Company (1964) 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, and Lehrman v. Gulf Oil Corporation (5th Cir. 1972) 464 F.2d 26, because "the element of coercive leverage inherent in the pricing policy is missing." "At most, the undisputed facts establish that when plaintiffs exercised their independent pricing discretion, Union attempted to keep them in line by coercive techniques independent of its widespread pricing program. An isolated, atypical application of coercion upon dealers who are purchasing gasoline under an inherently benign pricing system would not have set a threatening example to other wholesalers who had never been promised the business benefits withheld in the first place. The coercion applied to plaintiffs had no more effect on the gasoline industry than the regulation of the prices charged by plaintiffs in their local operations."
 
 
 16
 These conclusions rest upon a mischaracterization of the conduct attributed to Union and upon a misreading of both Simpson and Lehrman. The district court apparently assumed that Simpson did not apply because Union's price support system was not on its face a forbidden price-fixing agreement, and that Lehrman did not apply because the coercive techniques used to force appellants to raise their prices did not involve withdrawal of the company's price support program. The district court's restrictive reading of Simpson and Lehrman is unjustified.
 
 
 17
 Resale price maintenance in violation of the Sherman Act is an actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market, and "it matters not that the complainant may be only one merchant." (Simpson v. Union Oil Company, supra, 377 U.S. at 16, 84 S.Ct. at 1054.) Lehrman extended this principle to find jurisdiction under the Sherman Act for an independent service station operator in Texas: "Because of the broad scope of the (price support) mechanism, however inherently compatible with competition, the treatment of Lehrman when he disobeyed Gulf's price 'suggestions' transformed a practice benign on its face into a coercive practice with untold geographical potential for deterring Gulf retailers from freely determining their own retail prices. . . ." (464 F.2d at 32.)
 
 
 18
 Judge Wisdom rejected Gulf's proffered distinction that its price support program was a facially benign business practice subject to intermittent anticompetitive abuse "as applied" only on a case-by-case basis, while in Simpson, the single, intrastate operator was permitted Sherman Act jurisdiction because Union's "consignment agreement" was anticompetitive "on its face." Judge Wisdom noted that the policies of the Sherman Act would be enfeebled if Simpson could be distinguished as Union successfully urged below: "It would be exceedingly unfortunate if large enterprises could, without federal antitrust liability, use small, intrastate operators as a way of making known certain unspoken and unwritten features of broadly utilized business practices which are not anticompetitive on their face." (464 F.2d at 33.)
 
 
 19
 For Sherman Act purposes, it matters not at all whether Union chose to drive appellants out of its market by exercising a 90-day option to cancel their dealer contract or by withdrawing its price supports. The impact is identical. Independent dealers similarly situated to appellants in either event received the message that obdurate price cutters faced dealer contract cancellation.
 
 
 20
 We cannot say that the omnipresent threat of dealer contract cancellation for failure to conform one's retail prices to those announced by Union's price support program is not coercive. The effect of Union's conduct is to eliminate effective intrabrand price competition among Union dealers within its Western Region. Viewed in the aggregate, an absence of effective intrabrand price competition produces a substantial economic impact upon interstate commerce.
 
 
 21
 The district court assumed that no coercive effect upon other dealers could have been exerted when Union withheld the jobbership and withheld the sign rental discount because other dealers in the area had not been promised similar benefits. That assumption overlooks the practical effect of Union's action. The point is that other dealers were made aware that Union would retaliate against any dealer who failed to follow Union's pricing dictates. Especially is that true on this record where Union undertook retaliatory action in response to complaints from Union dealers who were following Union's pricing policies. Based upon the averments of the complaint, which must be taken as true at this juncture of the case, Union's alleged conduct in violation of the antitrust laws adversely affected the appellants and potentially created anticompetitive effects upon other dealers in the ten states comprising Union's Western Region. (Simpson v. Union Oil Company, supra, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; Boddicker v. Arizona State Dental Association (9th Cir. 1977) 549 F.2d 626; Lehrman v. Gulf Oil Corporation, supra, 464 F.2d 26.)
 
 
 22
 Appellants have asked us to overturn several discovery rulings of the district court relating to: (1) the correspondence to and from Union division managers about its resale price-fixing programs for the years other than 1972; (2) the complete credit files of Union concerning appellants; (3) Union's authentication of documents pertaining to its pricing program; (4) disclosure of all special arrangements with resellers who owned or controlled the real property; and (5) information about exchange agreements and advertising expenditures. The district court, of course, has wide latitude in controlling discovery, and its rulings will not be overturned in absence of a clear abuse of discretion.
 
 
 23
 The district court's extremely restrictive rulings on discovery issues appear to have been substantially influenced by its erroneous view that the activities charged related only to intrastate commerce and by its erroneous assumption that the discovery rules, as presently framed, must be relevant to the precise issues framed by the pleadings, rather than by the general relevance to the subject matter. We decline at this time to review each and every one of these discovery rulings; rather, we direct the district court to reconsider the challenged rulings in the light of our views as expressed in this case, together with Simpson v. Union Oil Company, supra, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; Continental Ore Co. v. Union Carbide & Carbon Corp. (1962) 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777; and Cornwell Quality Tools Co. v. CTS Co., Inc. (9th Cir. 1971) 446 F.2d 825.
 
 
 24
 We do not discuss the claim that the district court abused its discretion in preventing appellants from amending their complaint to assert cross-claims for alleged fraudulent promises of sign rental. This issue has become moot because the underlying dispute was resolved in the state court action decided after the briefs in this case were filed.
 
 
 25
 The judgment is reversed and the cause is remanded for further proceedings consistent with the views herein expressed.
 
 
 
 *
 Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation