# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2148

_____

| | | |
|---|---|---|
| Ozark Heartland Electronics, Inc.; | * | |
| Daniel G. Boone, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| Radio Shack, a Division of | * | District Court for the |
| Tandy Corporation; | * | Western District of Missouri |
| Tele-Communications, Inc.; | * | |
| TCI K-1, Inc.; Phoenixstar | * | [TO BE PUBLISHED] |
| Partners, L.P., formerly known as | * | |
| Primestar Partners, L.P.; United Artists | * | |
| K-1 Investments, Inc.; TCI Satellite | * | |
| Entertainment, Inc.; Phoenixstar, Inc., | * | |
| formerly known as Primestar Inc., | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: December 12, 2001

Filed: February 1, 2002

_____

Before LOKEN and BYE, Circuit Judges, and BOGUE,[1] District Judge.

_____

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

BYE, Circuit Judge.

Daniel Boone owns and operates Ozark Heartland Electronics, a retail electronics store once affiliated with Radio Shack, America's largest retail electronics chain. In 1996, Ozark participated in a Radio Shack marketing campaign showcasing a satellite television service produced by Primestar. Radio Shack and Primestar later terminated Ozark's participation in the marketing campaign, at which point Boone and Ozark sued them for violating the Sherman Act, 15 U.S.C. § 1, and Missouri law. The district court[2] granted summary judgment to Radio Shack and various Primestar partnerships. We affirm.

I

In the early 1990s, Primestar developed technology permitting customers to receive television signals from a small satellite dish at an affordable price. Primestar's service includes an outdoor satellite dish and table-top receiver, plus satellite programming and regular maintenance. Primestar distributes the satellite television service to consumers through its Partner Affiliate Distributors (PADs). PADs authorize new subscriptions, install equipment, commence programming, bill and collect monthly fees, and bear the costs and expenses incurred in renting Primestar equipment to customers. When customers cancel subscriptions, PADs retrieve and disassemble the Primestar equipment. PADs also have discretion to establish installation fees and monthly prices for the Primestar service within their respective coverage areas.

In the mid 1990s, Primestar turned to Radio Shack seeking to expand its market presence. In February 1996, Radio Shack entered into a Marketing Agreement with Primestar. The agreement provided that Radio Shack and its affiliated stores would

---

[2]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

-2-

promote Primestar's satellite television service to consumers on behalf of Primestar's PADs. The agreement authorized participating Radio Shack stores to display the Primestar service, solicit subscribers, answer customer inquiries, and collect from subscribers a prepayment on the local PADs' installation fee.

When the Marketing Agreement took effect, Ozark had been operating as an independently-owned Radio Shack affiliate for nearly three years. Ozark agreed to participate in the Primestar marketing initiative and began displaying the satellite television service to customers in August 1996. At that time, Primestar had suggested a prepayment fee of $149, which many PADs adopted as their charge. Independent Radio Shack dealers collected the $149 fee from each new subscriber and retained a commission of $100. The dealers remitted the remaining $49 to Radio Shack, which received an additional $50 commission directly from Primestar.

Ozark declined to charge the $149 prepayment rate. Ozark charged customers only $99 because Boone believed he could draw additional business to his store by undercutting competitors' prices. The PAD who serviced Ozark-generated customers learned of Ozark's reduced price and complained to Primestar because the Marketing Agreement did not permit Radio Shack dealers to alter the prepayment amount charged to new subscribers. In November 1996, Primestar and Radio Shack ordered Boone to bill new subscribers at the $149 rate, but he refused. Radio Shack then stripped Ozark of its authority to sign new Primestar subscribers in December 1996.

Ozark continued to sell Radio Shack products under the terms of an authorized sales agreement until June 1997. Radio Shack severed its relationship with Ozark at that time because Ozark had not purchased for resale $30,000 in merchandise during the preceding fiscal year, a condition of the sales agreement.

Ozark and Boone sued Radio Shack and several Primestar partnerships in December 1998. The complaint stated a claim of resale price maintenance, in

violation of the Sherman Act, and claims of breach of contract and tortious interference with contract under state law. The district court granted the defendants' motions for summary judgment on each claim. Ozark and Boone now appeal, and we review de novo the propriety of summary judgment. See Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 659 (8th Cir. 2000).

II

Ozark argues that Radio Shack and Primestar conspired to fix the price at which Ozark could sell the Primestar satellite television service to consumers. Ozark claims this was resale price maintenance, a per se violation of the Sherman Act.

The Sherman Act imposes liability on manufacturers who fix the minimum price at which buyers must resell their products. Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373, 404-409 (1911). But this rule does not apply when a manufacturer directs his agent to sell at a particular price. United States v. General Electric Co., 272 U.S. 476, 488 (1926). Only a *genuine* agency relationship operates as a defense to a charge of resale price maintenance, so courts must carefully scrutinize the precise form of parties' business dealings. A manufacturer does not insulate himself from liability by trading with fully independent buyers under the guise of a sham agency. Simpson v. Union Oil Co., 377 U.S. 13, 21-22 (1964).

In Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215 (8th Cir. 1987), we culled from the Supreme Court's decisions in Dr. Miles, General Electric and Simpson four elements of a resale price maintenance claim. "To establish a case of resale price maintenance by a manufacturer, the antitrust plaintiff must demonstrate that (1) the manufacturer has contracted, combined, or conspired (2) with a separate economic entity (3) to set the price at which the products are resold (4) in an independent commercial transaction with a subsequent purchaser." Ryko, 823 F.2d at 1222-23. The particular facts presented in Ryko drew our attention to the second

element—whether the manufacturer and the antitrust plaintiff were separate economic entities. We held Ryko did not violate the Sherman Act by requiring its distributor, Eden, to resell automatic car-washing equipment to customers at a fixed price because Eden was Ryko's agent. Id. at 1226; see Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1316-18 (8th Cir. 1986) (holding that agents generally are incapable of engaging in antitrust conspiracies with their corporate principals).

In the present case, the district court found instructive Ryko's detailed discussion of the "agency defense" to a resale price maintenance claim. Ryko defines an agent as a party who bears few or none of the economic risks associated with distributing the manufacturer's product. Conversely, an independent economic actor bears most or all of the relevant economic risks. Following Ryko's mandate, the district court "examine[d] the various substantive indicia of entrepreneurship and the allocation of business risks," 823 F.2d at 1223 (internal quotation and punctuation omitted), to determine whether Ozark was an agent or an independent actor.

The district court had little difficulty concluding Ozark behaved as an agent—a mere order-taker for Primestar's PADs under the terms of the Marketing Agreement. See Morrison v. Murray Biscuit Co., 797 F.2d 1430, 1437 (7th Cir. 1986) (detecting an agency relationship because "Feldman really is just an order taker for Murray Biscuit and other suppliers."). Ozark displayed the Primestar service in its store, promoted and marketed the product to customers, transmitted orders to PADs and collected a commission for each subscription. But Ozark never accepted the business risks of providing the satellite television service to customers, repairing and maintaining equipment, or billing subscribers. The district court concluded that Ozark brokered deals between willing customers and Primestar's PADs and was not "an independent businessman who bears most or all of the risks on transactions with purchasers." Ryko, 823 F.2d at 1223.

We largely agree with the district court's analysis, but we find it more straightforward to approach this case under Ryko's fourth element—whether the antitrust plaintiff engaged in an independent transaction with a subsequent purchaser. Cf. Hatchett v. Philander Smith Coll., 251 F.3d 670, 674 (8th Cir. 2001) (indicating we may affirm a summary judgment on any ground supported in the record).  There is a glaring deficiency in Ozark's resale price maintenance claim: Ozark neither bought nor resold Primestar's satellite television service.  Ozark took orders for PADs, who provided customers with the Primestar service and with hardware necessary to receive that service.  Ozark also transmitted subscription orders and received a commission in return.  But Ozark never purchased Primestar's satellite television service, nor resold that service to customers.

The deposition testimony of Pamela Boone, Ozark's store manager, confirms the point.  With respect to the Primestar service, Ms. Boone acknowledged that Ozark operated, in effect, a showroom without inventory.  Ozark never purchased Primestar's satellite equipment, stored or rented such equipment, sought or obtained permission to provide subscribers the satellite signal or television programming, or repaired, maintained or installed Primestar equipment or programming.  Ozark's conduct was comparable to a travel agent, who brokers a transaction between an airline and a consumer, but "does not purchase a seat for resale and does not hold an inventory of seats."  Ill. Corp. Travel, Inc. v. Am. Airlines, Inc., 806 F.2d 722, 725 (7th Cir. 1986).  Because Ozark never purchased a product or service from Primestar, Ozark obviously could not resell such a product or service.  See id. ("Travel service operators do not resell air travel.").  Radio Shack and Primestar cannot have fixed the price at which Ozark resold the Primestar service if Ozark sold nothing.

Ozark distinguishes Ryko because it concerned the sale of goods (automatic car-washing equipment) rather than services (Primestar programming).  Ozark says it makes sense to define an agency relationship in terms of risk-bearing when a retailer purchases *goods* from a manufacturer, but not when a retailer purchases

*services*. This distinction is beside the point for our purposes because it addresses Ozark's argument that it is not an agent (Ryko's second element), while we hold that Ozark never resold the Primestar service (Ryko's fourth element). But we are inclined to reject Ozark's distinction in any event. Both goods and services may be resold, and the rule against resale price maintenance applies equally to both categories. Cf. Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 16-21 (1979) (discerning no vertical price-fixing in a sale-of-services case involving copyright licensing). Ryko's four-element framework expertly captures the tenor of the Supreme Court's resale price maintenance decisions and we perceive no good reason to bifurcate our jurisprudence in the fashion Ozark suggests.

Ozark did not engage in independent commercial transactions with Primestar subscribers, Ryko, 823 F.2d at 1223, so it cannot establish the defendants' liability for resale price maintenance. We therefore affirm the district court's summary judgment on Ozark's Sherman Act claim.

III

We turn now to Ozark's claims under Missouri law for breach of contract and tortious interference with contract.

Radio Shack terminated its authorized sales agreement with Ozark in June 1997. The agreement plainly stated Radio Shack could abandon the agreement (following appropriate notice) if Ozark failed to purchase at least $30,000 worth of merchandise for resale during the preceding fiscal year. On appeal, Ozark concedes it failed to meet the purchase requirement during the fiscal year preceding June 1997. Nothing in the authorized sales agreement provides Ozark an exception to the $30,000 purchase requirement based upon economic or other unforeseen difficulties. Ozark was strictly required to meet its purchasing obligation, and, by its own admission, it did not. Ozark's breach of contract claim therefore fails.

Ozark also contends Primestar induced the breach of the authorized sales agreement with Radio Shack. Ozark says it drew many customers to its store by marketing the Primestar service. When Primestar forbid Ozark from marketing its service, Ozark claims it lost revenue, effectively preventing it from purchasing $30,000 of Radio Shack merchandise during the final year of the parties' agreement.

The tortious interference claim based on these events fails because Ozark's underlying breach of contract claim lacks merit. Missouri law requires a plaintiff to prove a contract was breached as part of his claim of tortious interference. Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996). Because Radio Shack did not breach the authorized sales agreement, Ozark cannot prove an element of its tortious interference claim, see St. Louis Convention & Visitors Comm'n v. Nat'l Football League, 154 F.3d 851, 865 (8th Cir. 1998), and thus the district court properly granted summary judgment against the plaintiffs on this claim.

IV

We affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.